# CASES

IN THE

# SUPREME JUDICIAL COURT,

OF THE

# STATE OF MAINE.

---

STATE OF MAINE, BY INFORMATION OF ATTORNEY GENERAL,

*vs.*

THE OLD TOWN BRIDGE CORPORATION.

Penobscot. Opinion August 6, 1892.

*Corporation. Charter. Ouster. Waiver by State. Special Act, February 9, 1827; January 29, 1829; August 6, 1846; August 8, 1846.*

By special Act of February 9, 1827, the defendant was chartered to erect and maintain a toll bridge over the Penobscot river "at or near the village of Old Town," the legislature reserving the right to revise and change the tolls at any time after ten years. By an additional Act of January 29, 1829, the right to take tolls was extended to forty years, provided, that, at the end of said term, said bridge shall revert to the State. In 1831-2, the defendant completed and opened its bridge under the original charter and several subsequent acts. It was located nearly one half mile below the head of Old Town Falls, and was maintained there until March, 1846, when the easterly span, the largest part, was swept away by a freshet. By special Act of August 6, 1846, before the rebuilding of defendant's bridge, another corporation, the Old Town and Milford Bridge Company, was chartered to erect and maintain a toll bridge over the river "at the Old Town Falls."

Section eleven of this new charter provided that some one of its corporators should within fifteen days after its approval furnish a copy thereof to the defendant; and if before September 10, following, the defendant should give any two corporators of the new company written notice of the defendant's election "to build a bridge at Old Town Falls, and on or before October 1, following, shall actually commence the erection, and, within a reasonable time thereafter, complete the bridge,— then the new charter should be null and void," &c. Such notice was accordingly given and defendant rebuilt its bridge at the old location. By special Act of August 8, 1846, it was pro-

vided that, "so much of the Act of January 29, 1829, as relates to the reversion of the bridge to the State, be repealed,— provided that this Act shall not take effect unless the proprietors [defendant] shall elect to build a bridge at the Old Town Falls," . . . "according to the provisions of the new charter."

Upon an information filed by the Attorney General to enforce the reversion of the bridge to the State and forfeiture of the charter, upon the ground of usurpation by the defendant since 1872, the court having been aided by jury findings, *it was held*: that the phrase, "at or near the village of Old Town," in the defendant's charter, and that of "at the Old Town Falls," selected for the new one, designate different localities; that the bridge was not rebuilt at the place intended by the Legislature; and that the defendant's tenure of forty years was determined by its own limitation.

The doctrine of waiver on the part of the State of the breach of a condition is not applicable when, as in this case, by the terms of the defendant's charter the franchise absolutely determined upon failure to perform the condition therein contained.

An application by citizens to the Legislature, reciting the charter of the corporation and the clause of forty years' limitation, asking the State to take possession and make it a free bridge, will not revive the defendant's tenure of the bridge where there is no legislative action beyond the report of a committee with leave to withdraw granted to the petitioners.

In proceedings of the above nature there may be judgment of ouster of a particular franchise, and not the whole charter.

ON REPORT.

This was a proceeding in *quo warranto*, brought in behalf of the people through the Attorney General to declare and enforce the reversion to the State of the defendant's title to the Old Town toll-bridge, in accordance with the provisions of the defendant's charter.

The cause was submitted to the jury under instructions from the Court to determine whether the bridge had reverted as claimed. The verdict of the jury determined that the bridge had reverted to the State.

Before submission to the jury, it was stipulated by the parties as follows: This cause is submitted to the jury upon the evidence presented, under such instruction as the court sees fit to give them ; and, after their verdict shall have been returned, the case is to be submitted to the Law Court for the Law Court to enter such judgment as the legal rights of the parties may require.

The defendant filed a motion for a new trial and excepted to the instructions at the trial.

The following portions of the presiding justice's charge, and marked with brackets, exhibit some of the instructions to which the defendant took exceptions :

"So, then, you will determine whether or not the present structure, which was built in 1846 by the defendant corporation, was built 'at the Old Town Falls' in the town of Old Town? If it was, within the meaning of the law as I shall further give it to you, then, gentlemen, your verdict will be for the defendant. If not, then, gentlemen, your verdict will be for the plaintiff, provided the legislature has not waived the right.

"So, then, let us see whether the defendant corporation did build the bridge 'at the Old Town Falls' in the town of Old Town. In the first place, was the locality, the falls, the Old Town Falls? Now, gentlemen, you will determine what locality was meant by the Legislature in that charter. You will take into consideration the natural meaning of the words in the first place, and, what is common knowledge, that a fall of water, or falls of water, is where water is falling in contradistinction to running. The tail of a fall may be said to be in certain cases where the water ceases to fall and begins to run. Now falls, in the common acceptation of the term, may be a series of cascades ; cascades, a fall of water, running water, a further fall, running water mixed with stones and rips, and finally another fall. So after all, you will determine, as a matter of fact, from whatever evidence you have heard in this case and from your own observation, where the Old Town Falls are ; what piece of territory, what extent of territory up and down the river the name at that time was understood to refer to and to include. The plaintiff says it was only the pitch of water above the islands, and so much of it as was falling water down to the top, or to the upper part of Eagle Island. The defendant says it refers to the quick water in and about the river there, from the first pitch to below Webster's Island and below the Dwinel mills — that the Dwinel mills were located upon the lower falls and that all that water was known as the Old Town Falls. You have seen it ; now, gentlemen, you will judge.

"The Legislature provided that the bridge must be erected 'at

the Old Town Falls.' Now, gentlemen, the word 'at' does not mean 'on.' It is a more indefinite word than that. The words 'in' and 'on' are more definite words than the word 'at.' The primary meaning of the word 'at' is near to. As given in Webster's dictionary it is this : 'Primarily, this word expresses the relations of presence, nearness in place ; as at the house. . . It is less definite than 'in' or 'on.' At the house may be in or near the house. So, gentlemen I instruct you that in this case the word 'at,' in that act of the Legislature would authorize or imply that the bridge might be built either over the falls, on the falls, above the falls or below the falls, if it was in the immediate proximity, within such reasonable distance of the fall as the exigencies of the case might require, taking into consideration the formation of the land, all the situation about there, the water, the expense of building, the facilities for building and the cost of placing it either a little above the falls, on the falls, or a little below the falls. You have observed the locality ; you have seen what facilities there are for the bridge ; you have had detailed to you what need there was long years ago, in 1846, when this bridge was built, what necessity there was for a bridge there and where the business in the village was located, and you will say whether or not this bridge complies with the description in that act. You are not to be governed by that act so far as literally to require the construction of the bridge on the falls ; but if the bridge was built at, that is, reasonably near the falls, taking into consideration all the exigencies of the time and the case and the situation, then, gentlemen, it is your duty to say it is complied with ; and if you find under those facts, that the provisions of the act of the Legislature have been complied with, then gentlemen, your verdict must be for the defendant.

"Now, if you are of opinion that it had not been complied with, the defendant says further that the State has waived its right to insist upon any forfeiture because the matter was once before the Legislature by petitioners asking that the State enter and take possession of this bridge by reason of its forfeiture, and that the Legislature voted the petitioners leave to withdraw,

thereby indicating the design and intention of the Legislature not to enforce this forfeiture, but to allow the bridge corporation to still retain it. You will bear in mind that the charter of the bridge corporation did not expire in forty years, but, at most, that at the end of forty years the bridge should become forfeited to the public. Now, I instruct you, as matter of law that, if these petitioners asked the State to interpose and take possession of this property by reason of the forfeiture incurred, because the bridge was not built in a proper place, and the Legislature heard the parties and decided the question, and decided that they would not take possession, would not interfere, this waived the public right and the Attorney General cannot prevail in this case; but if, on the other hand they had a hearing before a committee, and the corporation through its officers, induced those petitioners to withdraw their petition from any inducement held out to them, if they induced the petitioners to inform the committee that the matter had been arranged and that no judgment of the Legislature was asked in the premises, and the committee, thereupon, without adjudicating upon the merits of the case, but finding that the parties had come to an agreement, simply reported to the House leave to withdraw, and leave was so granted, then, gentlemen, the State would not have waived its right; because, in order for the State to have waived its right it must have acted deliberately, it must have decided the question in this case upon the merits, and if it did not do that, then it has not waived its right.

"Now, gentlemen, in this case I ask you to consider all the evidence and determine whether or not there has been a compliance with the terms of the act requiring the bridge to be built at the Old Town Falls. If, under the instructions I have given you, the old bridge, as originally built, was a substantial compliance with the terms of this act, then, though it had stood there before, if it was a substantial compliance with the terms of the act, I instruct you that it was not necessary for them to abandon that site and to build a new bridge at a new place. But if, on the other hand, it was not, then, gentlemen, it was necessary, in order for them to avoid this forfeiture, to have

abandoned that place and come so near the falls or at such a place as would be a substantial compliance with the terms of the act, to wit: At the falls, which means either on the falls, or reasonably near the falls under all the circumstances of the case and the exigencies and necessities that existed at the time." . . .

The Court:— (to Mr. Woodard, counsel for defendant,) "You wish me to instruct the jury 'as to what weight should properly be given to the contemporaneous construction of the phrase in question, Old Town Falls, as evidenced by the acts of interested parties.' I do not know to what class of evidence you refer."

Mr. Woodard:—"I refer to the fact of the action of the defendant corporation in giving notice and electing to build the bridge and the acquiescence and doing nothing on the part of the Old Town and Milford Bridge Company."

The Court:—"Well, gentlemen, the fact that the old bridge corporation gave notice to the new corporation of its intention to build the bridge, in fact notified them that it already had done so, and the fact that they did nothing, are facts for you to take into consideration in determining really what was meant and understood to be meant at that time by the phrase 'The Old Town Falls.' [It is evidence that is not of great weight. It cannot signify anything more than what those parties may have understood or may not have understood. They may have understood it rightly; they may have understood it wrongly. It is a fact for you to take into consideration in determining, after all, what you think from all the evidence as to their acts in relation to there being a substantial compliance with the act of the Legislature requiring the bridge to be built at the falls."]

Counsel for the defendant also requested the presiding justice to instruct the jury that the State may have waived its right by non-action and long continued acquiescence in the possession of the bridge by the respondent corporation after the reversion, if the attention of the Legislature was called to the matter, full information of the forfeiture or reversion was given, and no action was taken. This instruction was denied and the defendant excepted.

*Baker*, *Baker and Cornish*, and *J. F. Gould*, for plaintiff.

Exception as to waiver : 2 Wat. Corp: pp. 742-3, note ; *Att'y Gen'l* v. *Petersburg R. R.* 6 Ired. 456 ; *People* v. *Manhattan Co.* 9 Wend. 351. Mere non-action by the Legislature cannot give vitality to a charter which has expired by limitation and already reverted. There must be some actual judgment of determination reached by the Legislature.

General law of the case : Purpose of proceeding is to obtain judgment of ouster from the illegal exercise of the usurped right of exacting tolls, and not a judgment *in rem* for a transfer of title of possession to the bridge. Remedy : R. S., c. 77, § 5 ; *Reed, Att'y Gen'l* v. *Canal Co.* 65 Maine, 132 ; *Goddard* v. *Smithett*, 3 Gray, 122-3, 125 ; *Att'y Gen'l* v. *Del. R. R.* 33 N. J. 282 ; *Com.* v. *Walter*, 83 Pa. St. 105 ; *State* v. *Vail*, 53 Mo. 97 ; High Ex. Leg. Rem. § 707 ; 2 Beach Priv. Corp. § § 436, 840 ; 2 Wat. Corp. § 385 and cases, § 744, note ; *Rex* v. *Amery*, 2 T. R. 515 ; *People* v. *Rensselaer R. R.* 13 Wend. 113 ; *Att'y Gen'l* v. *Salem*, 103 Mass. 139-140 ; *State* v. *Lyons*, 31 Iowa, 432 ; *State* v. *Turnpike Co.* 8 R. I. 182 ; *Att'y Gen'l* v. *Ins. Co.* 2 Johns. Ch. 371 ; *People* v. *Same*, 15 Johns. 358 ; *State* v. *Fid. Co.* 77 Iowa, 648. Defendant's title by limitation : *Fifty Associates* v. *Howland*, 11 Met. 102 ; *Props.* v. *Grant*, 3 Gray, 146-7 ; 1 Wash. R. P. p. 459 ; Tiedeman R. P. § 281, and cases ; *Little* v. *Watson*, 32 Maine, 219. Form of judgment : 2 Kent Com. 312, note ; 2 Beach Priv. Corp. § § 435, 841 ; *Att'y Gen'l* v. *Salem*, 103 Mass. 139 ; *People* v. *R. R.* 15 Wend. 113 ; *Ins. Co.* v. *Needles*, 113 U. S. 574 ; *People* v. *Dashaway Ass.* 84 Cal. 114 ; *Central Bridge Corp.* v. *Lowell*, 15 Gray, 106.

*Wilson and Woodard*, for defendant.

Suit can be maintained, if at all, at common law only. *Terret* v. *Taylor*, 9 Cranch, 51. Duration of corporation charter not limited, although the bridge or structure may have reverted to the State. There must be a judicial determination before dissolution of corporation. *Matter of N. Y. Elev. R. R. Co.* 70 N. Y. 337-8 ; 2 Mor. Priv. Corp. § § 1003, 1015 ; *Penob. Boom Corp.* v. *Lamson*, 16 Maine, 224-231.

No grounds of forfeiture. Legislative action to be had is implied in the right to revise tolls and right to take the bridge, and then a determination which right to exercise. State's right under Act of 1829, as modified in 1846, became a condition subsequent. Nothing done to revest title. *Spofford* v. *True*, 33 Maine, 283 ; *Birmingham* v. *Lesan*, 77 Maine, 494, 498. Title still remains in corporation. *Little* v. *Watson*, 32 Maine, 214-219.

Bridge at "Old Town Falls" under act of 1846 : Consider the situation. Defendant had prior right to build and under its own charter as well as at Old Town Falls. Its old charter was not amended or altered as to location and could build in no other place. Phrase to be interpreted generally. Contemporaneous interpretation and defendant's acts entitled to great weight. New company abandoned all their rights on getting notice of re-building this bridge. Officers of both companies understood what was intended and so governed their acts. *Knowles* v. *Toothaker*, 58 Maine, 172 ; *Edward's Lessee* v. *Darby*, 12 Wheat. 206-210 ; *Packard* v. *Richardson*, 17 Mass. 122-144 ; *Opinion of the Justices*, 3 Pick. 518 ; *U. S.* v. *Hill*, 120 U. S. 169, 182-3.

Verdict of jury advisory only. Question, whether defendant's title can be taken for breach of condition subsequent. *Hooper* v. *Cummings*, 45 Maine, 359-365 ; 4 Kent Com. (12th Ed.) p. 129 ; *Birmingham* v. *Lesan*, 77 Maine, 494, 498. State has waived its right to the reversion. *Goodright* v. *Davids*, Cowp. 803 ; *State* v. *Fourth N. H. Turnpike*, 15 N. H. 162, 168 ; *Com.* v. *The Tenth Mass. T. Corp.* 11 Cush. 171 ; *Willard* v. *Henry*, 2 N. H. 120. State estopped to claim reversion, when, in 1874, with knowledge of all facts, it declined taking action in the Legislature, and permitted defendant afterwards to expend a large sum of money, and justified the belief that the right of reversion was gone.

VIRGIN, J. By special act of February 9, 1827, the respondent,—"Old Town Bridge Corporation,"—was chartered to erect and maintain a bridge over the Penobscot river, "at or near the village of Old Town," "to connect Marsh Island with the main land" on the east side of the river, now known as Milford ; and

to take specified rates of toll which the legislature reserved the right to revise and change "at any time after ten years."

By an additional act of January 29, 1829, the right to change the rates of toll was extended to "forty years, provided, that at the end of said term, said bridge shall revert to the State."

Pursuant to the original charter and several subsequent additional acts, the respondent, in the fall of 1831 or spring of 1832, completed and opened its bridge consisting of two separate structures, one extending from Old Town to the island, and the other from the island over the eastern channel to Milford, on the east side of the river.

The bridge was located nearly one half of a mile below the head of "Old Town Falls" and was maintained there until March, 1846, when its larger part,— the span over the easterly channel to Milford,—was swept away by a freshet, leaving the pier and abutments standing.

By a special act of August 6, 1846, before the re-building of the respondent's bridge, another corporation, called the "Old Town and Milford Bridge Company," was chartered to erect and maintain a toll-bridge of specified dimensions over the Penobscot River "at the Old Town Falls," "to connect Old Town with the town of Milford."

Section 11, of this new charter, provided in substance that some one of its corporators should, within fifteen days after its approval, furnish a copy of the new charter to the respondent; and if, before September 10, following, the respondent should give to any two corporators of the new company written notice of the respondent's election "to build a bridge at Old Town Falls, and on or before October 1, following, shall actually commence the erection, and, within a reasonable time thereafter, complete the bridge"—then the new charter should be null and void, otherwise remain in full force.

As a counterpart of the foregoing provisions of the new charter, the Legislature, two days thereafter, viz : on August 8, 1846, passed an act additional to that of January, 1829, which provided that "so much of the act of January, 1829, as relates to the reversion of the bridge to the State be repealed—provided that this act

shall not take effect, unless the proprietors of said bridge [respondent] shall elect to build a bridge at the Old Town Falls, and shall on or before October 1, next, actually commence building such bridge, according to the provisions of the new charter."

The Attorney General, *ex officio*, in behalf of the State files this information in the nature of a *quo warranto*, for the purpose of enforcing the reversion of the bridge and the forfeiture of the chartered privileges, upon the alleged ground that the respondent ever since the expiration of the forty years' limitation mentioned, to wit, since 1872, has usurped upon the State the various powers, privileges and immunities incident to its corporation.

The respondent's answer denies the usurpations alleged and asserts that it is lawfully exercising the franchises and privileges mentioned ; and that in accordance with the provisions of section 11, of the new charter, the respondent, on September 5, 1846, gave to two of the corporators of the new charter written notice of its election to "build a bridge," and did actually commence and complete the erection of it, "at the Old Town Falls," and opened the same to the public, on or before October 1, 1846.

Thus is presented the principal issue in the case.

By agreement the case was submitted to the jury under instructions by the presiding justice, and after verdict, to be submitted to the law court for the rendition of such judgment as the legal rights of the parties require.

After the verdict, the respondent filed a motion to set it aside as being against law and evidence, and filed exceptions to certain rulings. Thereupon the cause, by agreement, was reported to the law court which was to render such judgment as the legal rights of the parties require ; pleadings, verdict, motion, exceptions, charge, and report of the evidence making part of the case.

On recurring to the reported evidence, it appears that, on September 5, 1846, the respondent, by vote of its proprietors " directed its clerk to notify, in writing, two of the corporators [named] of the new charter that it had elected ' to re-build its

bridge,' and had already so far completed the same that it would be open for public accommodation in ten or fifteen days;" which notice in writing was, on the same day, duly served on the new corporators named.

The preliminary question is, was written notice of the respondent's election "to re-build its bridge" and a seasonable completion of it upon its old pier and abutments, a compliance with the provision of section 11, of the new charter which expressly required the respondent to "build a bridge at Old Town Falls?"

The answer to the preliminary question of notice, as well as that of location, depends upon the fact whether the phrase "at or near the village of Old Town," designates the same place as the phrase "at the Old Town Falls," and was so intended by the Legislature.

The evidence shows that the respondent's bridge was originally built—and subsequently re-built on a spot 2384 feet,—nearly one half mile,—below the head of "Old Town Falls." The concurrent testimony of nearly a score of elderly residents, lumbermen, river-drivers and others is, that there is and for many years has been a place on the river, distinctively known as "Old Town Falls," commencing at the head of the fall near the "Veazie Piers," and ending a short distance below the head of Eagle Island; and that no other place on the river has, to their knowledge, ever been known by that name. There is also much documentary evidence of similar import. The distance covered by the falls is about eighty rods; and from the foot of the falls to the respondent's bridge is something like seventy rods. And we cannot exclude from our minds that the same facts as to the location of the falls are fully recognized in the opinion of the court in *Dwinel* v. *Veazie*, 44 Maine, 173.

The jury, after hearing the evidence and viewing the premises, must have found that the two descriptions were intended to designate two distinct localities.

The definition, of which the words "at" and "at or near" are susceptible, has quite frequently been the subject of legal adjudication; and their signification has been determined to depend largely upon the subject matter in relation to which they are used and the circumstances under which it becomes necessary

to apply them to surrounding objects.   Thus, where a statute requires a notice to be delivered to the defendant, or a member of his family "at his dwelling-house," a delivery in the yard one hundred and twenty-five feet distant therefrom was held insufficient.   *Kibbe* v. *Benson*, 17 Wall. 624.   So "at a town" means some place "within the town rather than without or even at the utmost verge but not in it."   *Ches. & O. Can. Co.* v. *Key*, 3 Cranch, 606.   "At or near" a certain spot upholds the location of a terminus of a railroad 2475 feet distant therefrom. *Fall River Co.* v. *Old Col. R. R. Co.* 5 Allen, 221.   So "near" a town may mean two hundred rods therefrom.   *Boston & Prov. R. R. Co.* v. *Midland R. R. Co.* 1 Gray, 340, 367.   So "at and near" may be considered synonymous.   *Bartlett* v. *Jenkins*, 22 N. H. 63.   See also numerous cases collected in 1 Am. & Eng. Ency. 840 *et seq.*

But whatever signification may be given to those words under various, particular circumstances, we are fully satisfied that the phrase "at or near the village of Old Town" used in the respondent's charter, and that of "at the Old Town Falls" selected for the new one, were intended to designate totally different localities.   And the fact that the Legislature adopted the latter phrase in the respondent's additional act of August 8, 1846, makes it morally certain that the intention was, if the respondent elected to build, it must do so at a place other than its old one.

The circumstances attending the promotion and passage of the two latter acts all point in the same direction—that the intention was not that the new charter should become void if the respondent re-built upon the old piers and abutments which escaped the flood.   The persons who sought and obtained a charter for another bridge, carried on business on and along both banks of the river opposite the Falls.   They wanted a bridge in their more immediate vicinity.   New buildings had been erected and new industries had been and were centering there.   Railroad accommodations were extending to that neighborhood.   Two bridges were not needed within one half mile of each other, they would not both pay.   And as soon as the principal part of the old bridge was swept away in March, 1846, those imme-

diately interested in having a bridge at the Falls applied, at the succeeding summer session of the legislature, for a charter which was provisionally granted. In seeming consideration of the loss of its bridge before the expiration of its term for taking tolls, the preference of building was given to the respondent, not absolutely, but upon two conditions: (1,) That it would forthwith "build a bridge at the Old Town Falls," (where the new corporation wanted it and were authorized to build one if the respondent did not elect to do it,) and (2,) That it should build it "under its own charter," but, "according to the provisions of the" new one, which are somewhat different from the old one.

Moreover, if the intention had been that the new charter should be annulled by the respondent's re-building upon the old location, the Legislature would have said so in terms, instead of adopting the precise language for definitely fixing the location, which, only two days before, had been selected for and used in the new charter for a like purpose. The evident intention was to accommodate the local as well as public business. Hence, in a spirit of compromise, the Legislature, by passing these two special acts, in substance said: One bridge only is needed in that vicinity. That one located "at the falls" will better accommodate all concerned than at the old location. And inasmuch as the old one went away twenty-six years before the term fixed for revising its tolls and the reversion of its bridge expired, the respondent, if it choose to, and will seasonably "build a bridge, under its own charter, according to the provisions of the new one at the falls," where the new company wish it, then the latter must be content.

It was not done. Our opinion, therefore, is that the respondent did not comply with the requirements of section 11, of the new charter, nor with the corresponding provision of its own amended charter.

What consequence resulted from such non-compliance?

The two acts of 1829 and 1846, both parts of the respondent's charter, must answer. The act of 1829 expressly limits the respondent's tenure to the fixed term of "forty years;" for

as it peremptorily declares, " at the end of said term said bridge shall revert to the State." Therefore, unless that limitation has been repealed, it continues in full force, and the respondent's tenure, without any notice, entry or claim whatever, terminated in 1872, "because it was determined by its own limitation." 4 Kent, 126-7 ; *Stearns* v. *Godfrey*, 16 Maine, 158, 160 ; *Ashley* v. *Warner*, 11 Gray, 43, 44 ; *Prop'rs, &c.* v. *Grant*, 3 Gray, 142, 147 ; 2 Wash. R. P. 21-2.   Will. R. P. § 133.

Was the limitation repealed? Potentially, but not absolutely. To the repeal was annexed a condition, the performance of which alone was expressly made the *sine qua non* of its becoming effective.

To be sure, the Legislature formed a lifeless body of a repeal out of the dust of words ; but the "building of a bridge at the Falls" was its only breath of life which was never breathed into it, and hence it never became a living repeal. No bridge at the Falls, no repeal. The limitation, therefore, remained in as full force as if the conditional repealing clause had never been passed.

It is contended, however, that assuming the repealing clause never became effective, even then the bridge did not revert by reason of an alleged waiver on the part of the State. We do not think this contention is tenable.

To be sure a charter of a private corporation, when accepted, is generally considered to be a contract between the State and the corporation. 2 Kent, 306 ; *Yarmouth* v. *No. Yarmouth*, 34 Maine, 418 ; *State* v. *Noyes*, 47 Maine, 189 ; *Hathorn* v. *Calef*, 2 Wall. 10. And a State as well as a private person may waive the breach of a condition contained in its contract. *State* v. *Fourth N. H. Turnpike*, 15 N. H. 162, 168. And if the State had seasonably claimed a forfeiture of the respondent's right to take toll at the old rates without revision, by reason of an actual breach of the condition contained in the act of 1829, viz : " that the said corporation shall, at all times, keep said bridge in good repair," then the same rule of waiver might apply to the State as to a private person in an analogous case. But as already seen, no condition was annexed to the reversion

of the bridge. It was an absolute limitation which has never been repealed or otherwise modified. The tenure of the respondent absolutely determined by its own terms. The statute fixing the limitation executed itself. And hence the doctrine of a waiver of a breach of a condition is in no wise applicable.

Thus, in *State* v. *Fourth N. H. Turnpike, supra*, where on an information by the Attorney General, a forfeiture of the franchise was claimed, the court said : "The doctrine of a waiver of a forfeiture by the legislature by subsequent legislative acts does not apply, if by the terms of the charter the franchise absolutely determines on failure to perform the conditions ; for as in such case the corporation has ceased to exist, the doctrine of a waiver is inapplicable."

So in *People* v. *Manhattan Co.* 9 Wend. 351, it was held that a forfeiture, incurred by non-compliance with the terms of a condition contained in a charter, may be waived by the legislature by subsequent legislative acts recognizing the continued existence of the corporation. The doctrine of a waiver, however, is not applicable, when by the terms of the charter the franchise absolutely determines upon the failure to perform the condition. See also, *In re Brooklyn W. & N. Ry. Co.* 72 N. Y. 245 ; S. C. 75 N. Y. 385 ; 81 N. Y. 69 ; especially *Brooklyn S. T. Co.* v. *Brooklyn*, 78 N. Y. 524, 529. *A fortiori* it is not applicable where the corporation's tenure of a bridge absolutely determines at the end of a fixed term of years in consideration of the unrestricted right of taking toll for so long a period.

It is further urged that the respondent's tenure of the bridge was revived by the action of the Legislature, in 1874, upon the petition of Hilliard and others, which after reciting the charter and its supplements and the clause relating to the forty years' limitation, prayed the State to take possession and make it a free bridge.

Assuming that the Legislature might, by some affirmative act, revive, extend and continue in force the respondent's tenure for another fixed or indefinite term ; or by some supplemental act actually recognizing its present tenure, (*Farnsworth* v. *Lime Rock R. R. Co.* 83 Maine, 440,) might thereby bring

about the same practical result; this record contains no evidence that any such action on the part of the Legislature ever took place. Practically the Legislature took no action.

A denial of the prayer of the petition, based upon a hearing before the committee and declared as a judgment which was intended to reach the merits of the case, might possibly be effective. But we are fully satisfied that the simple report of "leave to withdraw," considered in the light of the circumstances under which such leave was granted, neither had nor was intended to have any such effect as is contended. For the undisputed evidence shows that, after the petition was referred to the "Committee on Ways and Bridges," the respondent's president,—who had faithfully served his company more than thirty years,—and the representative of Milford and other towns of the class, had an interview, which resulted in an agreement that the committee might simply report "leave to withdraw." The merits of the case were never called to the attention of the Legislature by any formal report of facts or otherwise. No supplemental act was reported and no intelligent action whatever was taken for or against the prayer of the petition. Under such a state of facts, it would be idle to hold that the Legislature thereby intended to revive or to recognize the continued existence of the respondent's title after it expired by its forty years' limitation.

Notwithstanding the president's personal presence at the capitol, when and where the interview was had and the agreement made, he testified that he had no authority from his corporation for whatever he did or said in relation to the agreement. The full answer is that, whether he acted in the premises with or without authority, it is entirely immaterial, inasmuch as the committee based its action upon the agreement; and hence the Legislature took no action upon the petition by which it was intended to revive or in anywise recognize the respondent's tenure of the bridge.

As the case, by special agreement of the parties before as well as after verdict, comes forward on report, to the end that this court may "render such judgment as the legal rights of the parties may require," it is thereby placed substantially upon the

same rule as an equity suit, under which the "misrulings of the judge or the improper reception or rejection of evidence," are not considered of much moment, "if the court decides, upon the whole facts and circumstances, that the verdict is satisfactory." *Larrabee* v. *Grant*, 70 Maine, 82; *Carleton* v. *Rockport Ice Co.* 78 Maine, 49, 52. Forasmuch, therefore, as upon the whole facts and circumstances, the verdict is satisfactory, we, in the language of the respondent's brief "have not regarded the exceptions as very important;" although we have given them such examination as to become satisfied that the respondent has no just cause for complaint.

We are of opinion, therefore, that the bridge, together with the fixtures, appurtenances, and approaches necessarily incident thereto, reverted to the State in 1872, when the legal right of the respondent therein ceased. Also that the respondent's right to levy tolls against the public for passing over the bridge ceased at the same time. *Central Bridge* v. *Lowell*, 15 Gray, 106; *State* v. *Olcott*, 6 N. H. 74. Such was the contract between the respondent and the State in 1829. And the tolls for so many years have undoubtedly amply remunerated the respondent for all costs of building, maintaining and repairing the bridge.

"The right to build and maintain the bridge and the right to levy tolls, with the incidental and implied powers and privileges, constituted the entire franchise and qualified property of the respondent." *Central Bridge* v. *Lowell*, *supra*.

But as there may be a judgment of ouster of a particular franchise and not the whole charter, (*King* v. *London*, 2 T. R. 522; *People* v. *Renssellaer*, &c., *R. R. Co.* 15 Wend. 113, 128; *Att'y General* v. *Salem*, 103 Mass. 138; 2 Beach Corp. § 841; 2 Moraw. Corp. § 1030) we only award,

> *A judgment of ouster of the bridge and its appurtenances and of a seizure into the custody of the State of the franchise to levy tolls.*

WALTON, FOSTER, HASKELL and WHITEHOUSE, JJ., concurred.
LIBBEY, J., did not sit.